## UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF FLORIDA
#### ORLANDO DIVISION

**KARA BAKER,**

    **Plaintiff,**

**v.**               **Case No:   6:17-cv-1456-Orl-40KRS**

**PARK PLACE SURGERY CENTER,
L.L.C., SURGERY PARTNERS, LLC,
SGRY SP MANAGEMENT SERVICES,
INC., LAKE MARY SURGERY CENTER,
L.L.C. and NOVAMED SURGERY
CENTER OF ORLANDO, LLC,**

    **Defendants.**

_____

### REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT:**

   This cause came on for consideration without oral argument on the following motion filed herein:

| | |
|---|---|
| **MOTION:** | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** (Doc. No. 59) |
| **FILED:** | **August 7, 2018** |

## I.  BACKGROUND.

   Plaintiff, Kara Baker, initiated this action in state court on July 13, 2017.  Doc. No. 2.  The case was removed to this Court on August 7, 2017.  Doc. No. 1.  Baker filed her third amended complaint ("complaint") on January 10, 2018.  Doc. No. 39.  In her complaint, Baker alleges that Defendants—Lake Mary Surgery Center, L.L.C. ("Lake Mary Surgery Center"); Novamed Surgery Center of Orlando, LLC ("Novamed Surgery Center"); Park Place Surgery Center, L.L.C. ("Park Place Surgery Center"); SGRY SP Management Services, Inc.; and Surgery Partners, LLC—

violated the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA").   *Id.*   In Count I, she alleges that Defendants violated the overtime provisions of the FLSA.   *Id.*   ¶¶ 28-35.   In Count II, she alleges that Defendants violated the FLSA by terminating her employment in retaliation for complaining about Defendants' violations of the FLSA.   *Id.* ¶¶ 36-40.

Defendants filed a motion for summary judgment on August 7, 2018.   Doc. No. 59.   In support of their motion, Defendants submitted the following:

- A declaration from Meagan Przychocki (with attached pay records for Baker and an employee change of status form showing the reason for Baker's separation from employment) (Doc. Nos. 59-1 through 59-3);

- Excerpts from the transcript of Baker's deposition (and some exhibits referenced therein) (Doc. Nos. 59-4 through 59-7);

- A declaration from Angela Strum (Doc. No. 59-8);

- A declaration from Christina Geiger (Doc. No. 59-9);

- A declaration from Susan Gearhart (Doc. No. 59-10);

- A declaration from Lisa Prosperi (Doc. No. 59-11).

On August 21, 2018, the parties filed a stipulation of agreed material facts.   Doc. No. 62.   Baker also filed her response in opposition to Defendants' motion.   Doc. No. 63.   In support of her response, she filed the following:

- Baker's amended responses to Defendant Park Place Surgery Center, LLC's first set of interrogatories (including incorporated spreadsheet detailing her claim for unpaid overtime) (Doc. No. 63-1);

- Various documents relating to Baker's employment and the claims in this lawsuit, including cell phone records, time and pay records, and emails (Doc. Nos. 63-2 through 63-19);

- Excerpts from the transcript of Baker's deposition (Doc. No. 64-1);

- Excerpts from the transcript of the deposition of Christina Geiger (Doc. No. 64-2);

- Excerpts from the transcript of the deposition of Meagan Przychocki (Doc. No. 64-3).

Defendants filed their reply on September 4, 2018.   Doc. No. 65.   In support of their reply, they filed additional excerpts from the transcript of Baker's deposition.   Doc. No. 65-1.

After reviewing the parties' submissions, I ordered them to submit the following: (1) one paper copy of the complete transcript of the deposition of Kara Baker and all the exhibits identified during that deposition; and (2) one paper copy of every other exhibit to Defendants' motion for summary judgment, Baker's response in opposition, and Defendants' reply.   Doc. No. 66.   The parties' submitted a USB drive with what they represented was the original version of the spreadsheet that was incorporated into Baker's amended interrogatory responses and originally filed as pages 24-73 of Doc. No. 63-1.   They submitted paper copies of the remaining requested materials.   All of these materials are available for the Court's review.

Defendants' motion for summary judgment has been referred to me, and it is now ripe for decision.

## II.    LEGAL STANDARD.

A court should grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   It is the movant who "bears the initial burden of identifying for the district court those portions of the record 'which it believes demonstrate the absence of a genuine issue of material fact.'"   *Cohen v. United Am. Bank of Cent. Fla.*, 83 F.3d 1347, 1349 (11th Cir. 1996) (quoting *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1396 (11th Cir. 1994)*, modified on other grounds*, 30 F.3d 1347 (11th Cir. 1994)).   Once the movant carries its initial burden, the non-movant may avoid summary judgment by demonstrating an issue of material fact.   *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993) (citation omitted).   The non-movant must provide more than a "mere 'scintilla' of evidence" supporting its position, and "there must be

enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986)).   In this analysis, the Court is only required to consider the materials cited by the parties, but it may consider other materials in the record.   Fed. R. Civ. P. 56(c)(3).

When analyzing a motion for summary judgment, a court draws all reasonable inferences from the evidence in the light most favorable to the non-movant and resolves all reasonable doubt in the non-movant's favor.   *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Lubetsky v. Applied Card Sys., Inc.*, 296 F.3d 1301, 1304 (11th Cir. 2002)).   In addition, the court does not make credibility determinations when ruling on a motion for summary judgment.   *See Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (citing *Anderson*, 477 U.S. at 255).   Nonetheless, "[t]here is [still] no genuine issue for trial unless the non-moving party establishes, through the record presented to the court, that it is able to prove evidence sufficient for a jury to return a verdict in its favor."   *Cohen*, 83 F.3d at 1349 (citing *Anderson*, 477 U.S. at 249).

## III.   FACTS.[1]

### A.   *Overview of Baker's Employment.*[2]

At all times during her employment with Defendants, Baker was classified as non-exempt and paid at an hourly rate.   Doc. No. 62 ¶ 4.   She began working for Lake Mary Surgery Center as

---

[1] As required by the summary judgment standard, this section takes the facts in the light most favorable to Baker.

[2] I note here that the parties have not explained the relationships between and among the various Defendants.   It appears that they are related entities, although Baker's complaint does not allege that they are joint employers.   As set forth in the Facts section, the parties stipulated that Baker was employed by Lake Mary Surgery Center from October 7, 2013, until December 6, 2014; by Novamed Surgery Center from December 7, 2014, until July 5, 2015; and by Park Place Surgery Center from July 6, 2015, until April 28, 2017.   The parties do not explain the roles of Defendants SGRY SP Management Services, Inc., and Surgery Partners, LLC.   That said, I note that, earlier in this litigation, the parties stipulated that Baker was employed by SGRY SP Management Services, Inc., from January 1, 2016 through April 28, 2017, and that Surgery Partners, LLC was a "parent company."   Doc. No. 36-2 ¶ 1.

a GI Tech on an hourly, per diem basis on October 7, 2013.   *Id.* ¶ 1.   As a GI Tech at Lake Mary Surgery Center, Baker was responsible for logging biopsies, cleaning equipment, and assisting physicians during GI procedures.   *Id.* ¶ 2.   When Baker was hired, she was working between 36 and 40 hours per week while also attending school.   *Id.* ¶ 3.   During her time as a GI Tech at Lake Mary Surgery Center, Baker reported to administrator Meagan Przychocki.   *Id.* ¶ 5.

On December 7, 2014, Baker transferred to, and began working for, Novamed Surgery Center in downtown Orlando.   *Id.* ¶ 6.   At Novamed Surgery Center, she was employed as a Materials Manager on an hourly, full-time basis.   *Id.*   As a Materials Manager, Baker was responsible for tracking and editing Physician Preference Cards, ordering supplies, making sure that vendors and representatives had required equipment or implants, coordinating needed equipment, preparing invoices, keeping the supply room organized, and checking expiration dates.   *Id.* ¶ 7. From December 7, 2014, until July 5, 2015, Baker reported to the administrator of Novamed Surgery Center, Angie Sturm.   *Id.* ¶ 8.   Beginning in late 2014, Defendants allowed Baker to perform some duties at home.   Deposition of Kara Baker ("Baker Dep.") at 85, 89.[3]   Defendants provided Baker with a laptop she could use for remote work.   *Id.* at 85.   Baker continued to perform at least some remote work throughout most of the rest of her employment.   Doc. No. 64-2: Deposition of Christina Geiger ("Geiger Dep.") at 24, 40-41; Doc. No. 64-3: Deposition of Meagan Przychocki ("Przychocki Dep.") at 21.

On July 6, 2015, Baker transferred to, and began working for, Park Place Surgery Center. Doc. No. 62 ¶ 9.   At Park Place Surgery Center, Baker continued to work as an hourly, full-time

---

[3] Excerpts from Baker's deposition transcript are in the record in three different places.   *See* Doc. Nos. 59-4 through 59-7; Doc. No. 63-1; Doc. No. 65-1.   A paper copy of Baker's deposition transcript, plus exhibits, was also filed with the Court.   As a result, I cite only to the relevant page number from the original deposition transcript, not to any of the excerpts that were filed on CM/ECF.

Materials Manager. *Id.* From July 2015 until December 2016, Baker reported to Christina ("Christy") Geiger, who was the administrator of Park Place Surgery Center. *Id.* ¶ 10. From December 2016 until April 28, 2017, Baker reported to Przychocki. *Id.* Baker separated from employment on April 28, 2017. *Id.* ¶¶ 9-10.

       B.    *Time-Keeping Procedures.*

During Baker's employment, Defendants' time-keeping procedures required employees to clock in and clock out on a physical time clock. Doc. No. 59-1, Declaration of Meagan Przychocki ("Przychocki Dec.") ¶ 3; Doc. No. 62 ¶ 11. Each of the centers at which Baker worked had a physical time clock. Doc. No. 62 ¶ 11. In keeping with those procedures, Baker was given a time clock card so that she could record her in and out times. Baker Dep. at 14.

At times during her employment, Baker did not have a functioning time clock card. *Id.* At other times, Baker would fail to clock in or out using her card. *Id.* at 14-15. Moreover, when Baker worked from home, she could not clock in or out using her card. In those instances, Baker reported her time to her supervisors verbally or in writing via a Post-It note, e-mail, piece of notebook paper, or text message. Doc. No. 62 ¶ 13. In addition, when Baker worked at Park Place Surgery Center, there was a book for employees to record any edits to their time cards, and Baker also used that form of communication to record work times. *Id.* ¶ 14.

Whenever Baker used her time card to sign in or out, those times would be transmitted to Defendants' payroll system—ADP. Geiger Dep. at 27. In addition, when Baker reported additions or edits to her time, Baker's supervisors (Przychocki, Sturm, and Geiger) could and did add Baker's reported time to her ADP time card to ensure that she was paid properly. Przychocki

Dec. ¶¶ 7-10; Doc. No. 59-8, Declaration of Angie Sturm ("Sturm Dec.") ¶¶ 5-8; Doc. No. 59-9, Declaration of Christina Geiger ("Geiger Dec.") ¶¶ 3-5.[4]

If an employee worked more than four hours in a day (as measured by the time inputted into ADP), Defendants' ADP payroll system automatically deducted a 30-minute lunch break. Przychocki Dep. at 26.   So, if an employee clocked in at 9:00 a.m. and clocked out at 6:00 p.m., the ADP system would deduct 30 minutes and record the employee as having worked 8.5 hours that day.   *Id.*   During her employment, Baker sometimes worked through lunch.   When that occurred, she would report that information to her supervisors verbally or via hand-written note, email, or text message.   Baker Dep. at 93; Przychocki Dep. at 26-27, 30; Geiger Dep. at 28.   Baker's supervisors then could, and often did, mark "no lunch" on Baker's time card for that date, which credited Baker with an additional 30 minutes of work time per day.   Przychocki Dec. ¶ 12; Geiger Dec. ¶ 6; Sturm Dec. ¶ 10; Geiger Dep. at 30.   *See also, e.g.*, Doc. Nos 59-1, at 18; Doc. No. 59-2, at 18.

Defendants' employee handbook stated, "If an employee feels that an improper deduction or overpayment or underpayment has been made, he/she should immediately contact his/her supervisor or the payroll administrator."   Baker Dep. at 111 and Ex. 5 thereto (Doc. No. 59-7, at 40).   Baker also testified that, at the end of a pay period, she could and did pull up her time card information in ADP.   Baker Dep. at 15-16.   If she identified any errors, she could report them, and she testified at her deposition that she reported errors to Sturm and Przychocki.   *Id.* at 16-17. Baker testified that she never reported any errors to Defendants' payroll administrator and that she never reported any errors to Geiger.   *Id.* at 15, 16.

---

[4] Baker's supervisors actually averred that they added the time "to her time card."   Przychocki Dec. ¶¶ 7-10; Strum Dec. ¶¶ 5-8; Geiger Dec. ¶¶ 3-5.   It appears that, when they say that they added the times to Baker's "time card," Przychocki, Sturm, and Geiger mean that they would add the information into the ADP system.   *See* Geiger Dep. at 27-28, 30 (discussing entering time in ADP);   Przychocki Dep. at 21 (noting that she would "edit in the system" when Baker reported hours that had been worked from home). Defendants do not appear to have used physical, paper time cards.

B.       *Pay for Overtime Hours Worked on November 21, 2015.*

On November 12, 2015, Sturm asked Baker if she could work on Saturday, November 21, in Orange City.   Baker Dep. at 112-14; Doc. No. 59-7, at 56; Sturm Dec. ¶ 9.   Baker accepted.   *Id.* On that day, Baker worked as a GI Tech for a procedure performed by Dr. Gupta.   She worked from 6:45 a.m. to 2:30 p.m., plus 45 minutes to drive to Orange City and 45 minutes to drive home, for a total of 9.25 hours.   Doc. No. 59-7, at 58.   Baker had already worked 43.5 hours that week, so the additional 9.25 hours was overtime.   *See* Doc. No. 59-4, at 73.   As it happened, November 21 was the last day of the pay period.   *Id.*   Baker did not report her hours to Geiger, her supervisor, until after payroll had closed for the period.   Geiger Dec. ¶ 4.   As a result, the time could not be included on Baker's paycheck for that pay period.   *Id.*

On December 7, 2015, Baker contacted Defendants' payroll department because she was concerned with how Geiger was recording the November 21 hours.   The record is not entirely clear, but it appears that Geiger may have initially recorded the November 21 hours in the first week of the pay period starting on November 22—which resulted in Baker being given straight time for those hours.   *See, e.g.*, Doc. No. 63-14 ("Would you like for me to reach out to Christy as this should be paid on 12/5/15 and she may be confused that the previous week will not give you overtime."); Baker Dep. at 112 (testifying that Geiger "took [her] hours that [she] worked on a Saturday at Orange City, paid [her] straight time, and put them onto another day.").   Baker also contacted Sturm about the problem around the same time.   Baker Dep. at 112-13; Doc. No. 59-7, at 58.

Whatever the precise content of Baker's complaints, it is now undisputed that, ultimately, to ensure that Baker was properly paid for the November 21 time, Geiger added 9.25 hours of work, all of which were counted as overtime, to Baker's paycheck for the pay period starting November

22, 2015, by entering 9.25 hours of work for Saturday, December 5, 2015.   Doc. No. 59-4, at 75-76; Geiger Dec. ¶ 4.   That paycheck was issued on December 11, 2015.   Doc. No. 59-4, at 76 (noting pay date of December 11, 2015).   Baker does not dispute that she was properly paid for the November 21 hours on the paycheck following the pay period in which she worked the time.   Doc. No. 63, at 7 ¶ 40.

> ### D.   Baker's Claim for Unpaid Overtime.

Defendants' payroll records show that Baker was paid for significant amounts of overtime work during her employment.   Doc. No. 59-1, at 8-39; Doc. No. 59-2; Doc. No. 59-3, at 1-32. They also show that Baker's supervisors regularly marked "no lunch" on her time card, thereby overriding the ADP system's automatic 30-minute lunch break deduction.   *Id.*   The parties seem to agree that, if overtime hours were recorded in Defendants' ADP payroll system, then Baker was properly compensated for that overtime work.   Likewise, they seem to agree that, if Baker's time card was marked as "no lunch," then she was properly compensated for that work.

All of Baker's supervisors—Przychocki, Geiger, and Sturm—have averred the following: (1) to the extent Baker worked from home and reported her time, they recorded Baker's reported work time to her time card to ensure that she was paid properly; (2) when Baker reported that she worked through lunch, they would mark "no lunch" on her time card, which credited Baker with an additional 30 minutes of work time for that day; and (3) they never altered Baker's time card to reduce her time.   Przychocki Dec. ¶¶ 10, 12-13; Sturm Dec. ¶¶ 8, 10-11; Geiger Dec. ¶¶ 5-7. Przychocki and Sturm have also averred that, when Baker reported time edits or additional time, they would add that reported time to her time card to ensure that she was paid properly, even if the time was submitted after the close of the pay period.   Przychocki Dec. ¶¶ 7-8; Sturm Dec. ¶¶ 5-6. The supervisors' declarations do not explain how they reached these conclusions (for example, if

they reviewed written documents, text messages, or emails from Baker reporting her time and compared them to Defendants' ADP records).

At her deposition, Baker admitted that Sturm and Przychocki did not prevent her from properly recording her time.   Baker Dep. at 102.   As to Geiger, Baker admitted that she never said that Baker could not submit accurate time records or that Baker was not allowed to report overtime hours.   *Id.*

Nonetheless, Baker testified that she had worked overtime hours—both at Defendants' centers and at home—for which she was not properly compensated.   *Id.* at 13-14.   As relevant to this summary judgment motion, she testified that, if she wrote "no lunch" and went over 40 hours, then Geiger "wouldn't pay me that."   *Id.* at 220 ("And if I wrote 'no lunch,' and if it went over 40, [Geiger] wouldn't pay me that."); *see also id.* at 197 ("A: There were so many discrepancies once I figured out what [Geiger] was doing . . . . Q: And these were the discrepancies that we talked about earlier today?   A: Changing times and not adding no lunch, yes.").[5]

---

[5] Baker made this point again in portions of her deposition that Defendants did not submit with their summary judgment motion:

> A.   When I started recognizing that [Geiger] was changing my times, I started printing out the weekly ADPs, just because I didn't want—I wanted to make sure that that was happening so I needed something to compare by . . . .
>
> Q.   So you would actually print out the weekly ADPs contemporaneously with your pay period; is that what you're saying?
>
> A.   Correct.
>
> Q.   And then are those the time sheets that you used in creating the spreadsheet from which the information on here is partly derived?
>
> A.   Partly, yes.
>
> Q.   And again, would those be different than the ADP time sheets that we reviewed earlier today?
>
> A.   *The ones that she changed my time or did not give me no lunch, yes.*
>
> Q.   Okay.   And did you have any handwritten notes on those that were made at the time that that pay period occurred?
>
> A.   I don't recall, but I know what I submitted to her, it was—it had the times that I

In addition, in its interrogatories to Baker, Defendant Park Place Surgery Center, LLC asked Baker to provide an accounting of her time, including overtime hours worked. Doc. No. 63-1, at 11. Baker's amended response refers to an incorporated spreadsheet. *Id.* That spreadsheet provides, on a week-by-week basis, a precise listing of all the time Baker claims to have worked (including many "no lunch days") that was not reflected in Defendants' ADP time records. It also provides calculations that show when the omitted time resulted in unpaid overtime, including many weeks where adding in the lunch time automatically deducted by the ADP time system resulted in unpaid overtime.[6] Baker Interrogatory Spreadsheet, Entries for Weeks of Sept. 27, 2015 and Oct. 11, 2015. So, for example, for the week of September 25, 2016, the spreadsheet notes that Defendants' time records gave Baker 40 regular hours and 0 overtime hours for the week. It also notes that, in addition to other claimed unpaid time, Baker did not take lunch on any of the work days that week, resulting in 2.5 hours of unpaid overtime. Baker signed and verified the amended interrogatory answers. *Id.*, Entry for Week of Sept. 25, 2016.

At Baker's deposition, Defendants' counsel presented her with a spreadsheet that detailed the specifics of her overtime claim. Baker Dep. at 113 and Ex. 7.[7] Neither side clarifies whether

---

worked and no lunches.

Q. Okay. Were those handwritten time sheets that you're talking about?

A. Yes. And even though I clocked in, I still weekly gave her the paper.

Baker Dep. at 116-18 (emphasis added).

[6] When Baker originally filed her amended answers to the interrogatories and the incorporated spreadsheet, portions of the spreadsheet were truncated. In response to my Order requiring submission of a paper copy of the spreadsheet, the parties submitted a USB drive including what they represented to be the original version of the spreadsheet that was incorporated into Baker's amended interrogatory answers. That USB drive is available for the Court's review. In this Report and Recommendation, I cite to the spreadsheet as "Baker Interrogatory Spreadsheet."

[7] Despite citing deposition testimony that refers to the spreadsheet, Defendants did not file it in CM/ECF with their original motion. A paper copy is available for the Court's review.

the spreadsheet discussed at Baker's deposition is the same as the spreadsheet that she incorporated into her amended interrogatory responses.

At her deposition, Baker explained the genesis of the spreadsheet.   She testified that, on April 29, 2017 (the day after her separation from employment), she logged into ADP and printed out three years of her time records.   She then hand-annotated those records to reflect, in part, hours that she worked for which she believed she had not been compensated.   She marked a number of specific days as "no lunch."   Baker Dep. at 91-94 and Ex. 3.[8]   It appears that her attorneys then asked her to record the specifics of her overtime claim in a spreadsheet.[9]   Baker Dep. at 113.   Baker testified that, in creating the spreadsheet, she used text messages, a call log for her cell phone, emails, and hand-written time cards that she had at home to identify unpaid time.   *Id.* at 115-18.   When asked to clarify, Baker explained that the hand-written time cards were records that she created contemporaneously with the time worked and submitted to Geiger.   *Id.* at 117-18.   After Baker created her spreadsheet, she gave it to her attorneys.   One of those attorneys, Robert Sutton, then created a spreadsheet that details Baker's overtime claim, including multiple weeks where she was not credited with a "no lunch," thereby resulting in unpaid overtime.   That spreadsheet was produced to Defendants in discovery.   Baker Dep. at 113 and Ex. 7.   At her deposition, Baker could not definitively say whether the information in the attorney-created spreadsheet was accurate because she would need to compare it to her own records.   Baker Dep. at 115 ("Q.   In reviewing this document . . . please tell me whether or not this accurately reflects your alleged time that you say you were not paid.   A.   Without comparison, I can't accurately tell you yes or no.").   I have

---

[8] Despite submitting portions of Baker's deposition that discuss this exhibit, Defendants did not file it in CM/ECF.   A paper copy is available for the Court's review.

[9] This spreadsheet is not in the record because Baker's attorney objected to its production on attorney-client privilege grounds.   Baker Dep. at 114.   Defendants' attorneys never challenged that claim by filing a motion to compel.

reviewed the entirety of Baker's deposition transcript, and it does not appear that Defendants' counsel asked Baker whether she verified the accuracy of the spreadsheet incorporated into her amended interrogatory responses before signing and verifying those responses.

C.      *Baker's Nursing Program, Changed Schedule, and Separation From Employment.*

In 2014, while working for Defendants, Baker enrolled in classes at Herzing University so that she could pursue a nursing degree.   Baker Dep. 23-25.   In or around the beginning of 2017, Baker and Przychocki (who was supervising Baker at the time) discussed Baker's nursing program and the change to her school schedule which would require her to attend classes.   Doc. No. 62 ¶ 17; Przychocki Dec. ¶ 17; Baker Dep. 213-14.   Przychocki assumed that Baker would enroll in a night program.   Przychocki Dec. ¶ 17.

From March 6, 2017 until April 26, 2017, Baker was enrolled in an online course that required her to log in from 10:00 a.m. to 12:00 p.m. on Fridays.   Baker Dep. at 34-36.   Baker testified that, although she logged in at the required time, she did not pay attention to the lectures. *Id.* at 36.   Przychocki only learned that Baker was enrolled in a daytime class when she observed Baker "attending" one of these lectures while she was at work.   Przychocki Dec. ¶ 17.   Przychocki asked Baker what her school schedule was and if it would be interfering with work.   *Id.*   Baker told Przychocki that her schedule would be changing but did not provide Przychocki with her new schedule.   *Id.*

On April 10, 2017, Baker provided Przychocki with a proposed school schedule for the upcoming term.   *Id.* ¶ 18; Doc. No. 63-16, at 2.   The proposed schedule would require Baker to attend classes from 1:00 p.m. until 6:00 p.m. on Mondays and Wednesdays.   Przychocki Dec. ¶ 18. Przychocki told Baker that the schedule could not be accommodated because "Park Place [Surgery Center] requires a full time materials manager and that schedule does not meet the needs of the

center." Doc. No. 63-16, at 1.  Przychocki also noted that she was "under the impression [Baker

was] taking the night class."  *Id.*  Przychocki offered Baker the opportunity to continue to work on

a per diem basis in a different job at Park Place Surgery Center while she attended classes.

Przychocki Dec. ¶ 18.

On April 17, 2017, Przychocki sent an email to Baker and two other employees informing

them that they would be required to take a 30-minute lunch each day.  Doc. No. 63-17, at 3.

On April 20, 2017, Przychocki asked Baker what she had decided about school and whether

she had switched to the night program.  Doc. No. 63-18, at 3-4.  Baker responded by email saying

that there was no space available in the night program.  *Id.* at 3.  Przychocki responded, "Ok but

per our conversation we cannot accommodate your school schedule.  So will you be resigning from

your full time position?"  *Id.*  In reply, Baker stated that she was not interested in a per diem

position.  She also said, "Resigning was not something I intended to do as I need the health

benefits."  *Id.* at 2.  Przychocki then told Baker that she spoke to Sturm and to Human Resources

and that Baker's proposed schedule could not be accommodated.  *Id.*  She said that Baker would

not be able to keep her full-time status with the proposed school schedule.  *Id.*  Baker then sent the

following message:

> I will be keeping it.  I thought Full time status is 30-40 hours per week?  [I] will be
> keeping those hours.  When I accepted this job I was just starting the program and
> was told that they would work with my schedule.  I had to put school on hold
> because of my work load at [Novamed Surgery Center's downtown location] and my
> mother.  When I was told I was being transferred to [Park Place Surgery Center] by
> Kay's and Angie they told me to go back to school and finish my program that I
> would have more time to do so here at [Park Place Surgery Center].  I do not
> understand why the words of administrators are not being held to.  None of this was
> told to me several months ago when I told you was expected back into the program.
> I understand you thought I was in the night program, however when you asked me
> on multiple occasions if my classes were at night and I replied with I do not think so
> because [M]ay is the day program this would not be an issue.  I cannot resign so
> does this mean I will be let go?

*Id.* at 2.   Przychocki then told Baker that full time hours are 30-40 based on the needs of the center, but that Baker's proposed schedule did not meet the needs of the center.   *Id.* at 1.   Baker sent a reply in which she asserted her belief that the needs of the center would be met.   She then reiterated, "I cannot resign and I cannot drop out of school."   *Id.*   The email correspondence continued, and Przychocki eventually said, "You will not remain as the full time materials manager with the proposed school schedule.   Please let me know what you intend to do."   Doc. No. 63-19, at 3-4.

On April 24, 2017, Baker responded to Przychocki's April 17 email about the requirement that she take a 30-minute lunch each day.   She copied Human Resources representative Susan Gearhart on her response.   She wrote: "GM[10], for Monday the 17 the I had no lunch.   The 18th , 19 10 min lunch as it was interrupted by staff's needs.   The 20th no lunch due to issues with Dr. Perez and the lens."   Doc. No. 63-17, at 2.   Gearhart responded, saying that the intent of Przychocki's email was that, going forward, Baker would be required to take a 30-minute lunch. She explained that, if someone needed something during Baker's lunch, they would have to wait or, if there was an urgent issue, Baker would need to get approval to work through lunch.   *Id.*   Baker wrote that she understood, but that others were not respecting her lunch break.   *Id.* at 1.   Przychocki responded that the expectation going forward was that Baker would take a 30-minute lunch each day and that, if Baker were interrupted during lunch, she should advise the person that she was at lunch and would follow up with the person after her lunch break was over.   *Id.*

Also on April 24, Baker emailed Gearhart about Przychocki's most recent request that Baker "tell [her] what [she] intend[s] to do" regarding her employment, saying that she could not respond to Przychocki's email because she was "awaiting to hear back from legal counsel."   Doc. No. 63-19, at 3.   Gearhart responded, saying, in part, "You are a full time regular employee with us, as

---

[10]  It is unclear, but this may mean "Good morning."

such [your] work schedule revolves around the business need of the center."  *Id.*   Baker refused to respond, again saying that she was waiting to hear back from counsel.  *Id.* at 2.   At that point, Gearhart reminded Baker that the company has an open door policy and that a number of people were available to discuss Baker's concerns.   She also stated, "We will expect that you be working your regular schedule."   She copied the Vice President of Human Resources, Lainie Kennedy, on the email so that Baker could contact Kennedy.   *Id.*   Baker then asked for Kennedy's telephone number.   *Id.* at 1.   At 9:42 a.m. on April 24, 2017, Kennedy responded and provided Baker with her contact information.   *Id.*   The record is silent about what, if any, further communications the parties had about Baker's employment.

Baker's last day of work was April 25, 2017.   Doc. No. 62 ¶ 19.   Defendants' internal paperwork lists her date of separation as April 28, 2017, and gives the "Termination Reason" as "Schedule Conflicts."   Przychocki Dec. ¶¶ 21-22 and Ex. B thereto (Doc. No. 59-3, at 34).   At her deposition, Baker denied that she quit her job.   Instead, she said, it "was just kind of assumed . . . [t]hat [she] was not coming back."   Baker Dep. at 41-42.   She also testified that she disagreed that the Materials Manager position required full-time hours.   When asked why, she said:

> Because their cases had dropped, and the way I had it set up and looking at a schedule, knowing the doctors, that's why.   I mean, I knew—I knew because I had everything—I just had my niche.   I just had my thing down.

*Id.* at 214.   When asked how many hours she believed that the job would take per week, she said, "It depends.   That all depends if it's the end of the month, if a certain doctor is there.   So I don't know."   *Id.* at 214-15.   Ultimately, though, she testified that, on average, she believed that the position required 32 hours of work per week.   *Id.* at 215.   She admitted that she was not aware of any other Materials Managers who were allowed to take time off to go to school two days per week, for four or five hours on each of those days.   *Id.* at 213.

D.      *Baker's Complaints About Pay Practices.*

As detailed above, in late November or early December 2015, Baker contacted Defendants' payroll department about the fact that Geiger had improperly counted her November 21, 2015 hours as straight time instead of overtime.   Baker also contacted Sturm about the problem around the same time.   Baker Dep. at 112-13.

In the fall of 2016, at some point before Przychocki took over from Geiger as Baker's supervisor at Park Place Surgery Center, Baker informed Przychocki that "if [Baker] wrote 'no lunch' [on her time card,] and if it went over 40, [Geiger] wouldn't pay [her] that."   Baker Dep. at 219-20.   Baker also appears to have reiterated her complaint about Geiger's handling of the November 21, 2015 Saturday overtime.   *Id.*[11]

On April 30, 2017, after her employment had ended, Baker emailed Sturm, Przychocki, and Gearhart to complain about overtime she claimed to have worked during her employment but for which she had not been properly compensated.   Sturm Dec. ¶ 13; Przychocki Dec. ¶ 23; Doc. No. 59-10, Declaration of Susan Gearhart ("Gearhart Dec.") ¶ 7.

---

[11] The record includes evidence suggesting that, in December 2016, Baker complained to Gearhart that Geiger gave her paid time off (PTO) on August 16, 2016, when she actually worked a full day that day. Doc. No. 59, at 9 ¶ 39 (citing evidence).  Baker does not, however, rely on the complaint to Gearhart as purported protected activity under the FLSA.  *See* Doc. No. 63, at 7 ¶¶ 39-42; *see also id.* at 17.  In addition, Baker's complaint alleges that she complained to "Lisa Prospery" that her timesheets had been altered so that it would appear that she did not work overtime.  Doc. No. 39 ¶ 18.  Defendants have submitted a declaration from Lisa Prosperi, who avers that she never received any complaints from Baker regarding unpaid overtime compensation.  Doc. No. 59-11 ¶ 3.  Baker did not submit any contradictory evidence with her response, so I consider it undisputed that Baker did not complain to Lisa Prosperi about overtime violations.

## IV.   ANALYSIS.

In her complaint, Baker alleges that Defendants violated the overtime provisions of the FLSA (Count I) and retaliated against her in violation of the FLSA (Count II).   I discuss each claim separately, below.

### A.   Overtime Claim.

In Count I of her complaint, Baker asserts that Defendants violated the overtime provisions of the FLSA.[12]   Under the FLSA, an employer may not employ its employee for a workweek longer than 40 hours unless the employee receives overtime compensation at a rate not less than one and a half times her regular hourly rate.   29 U.S.C. § 207(a)(1).   A person is "employed" if she is suffered or permitted to work.   29 U.S.C. § 203(g).   "It is not relevant that the employer did not ask the employee to do the work.   The reason that the employee performed the work is also not relevant. '[I]f the employer knows or has reason to believe that the employee continues to work, the additional hours must be counted.'"   *Allen v. Bd. of Pub. Educ. for Bibb Cty.*, 495 F.3d 1306, 1314 (11th Cir. 2007) (quoting *Reich v. Dep't of Conservation & Nat. Res.*, 28 F.3d 1076, 1082 (11th Cir. 1994)). To prevail on a claim for unpaid overtime, a plaintiff must demonstrate (1) that she worked overtime without proper compensation; and (2) that her employer knew or should have known of the overtime work.   *Id.* at 1314-15 (citations omitted).   I discuss each of these elements separately, below.

---

[12]   I note that, in discussing this claim, neither party has made any attempt to distinguish between and among the various Defendants.   For example, Defendants do not argue that, even if summary judgment is inappropriate on this claim as to one of them, that it should be granted as to the others.   Because the parties have not distinguished among the Defendants in discussing this claim, I do not do so either.

1.   <u>Overtime Work Without Compensation</u>.

I recommend that the Court find that Baker has raised a genuine issue of material fact as to whether she worked overtime without proper compensation.   "Although a FLSA plaintiff bears the burden of proving that he or she worked overtime without compensation, '[t]he remedial nature of this statute and the great public policy which it embodies . . . militate against making that burden an impossible hurdle for the employee.'"   *Id.* at 1315 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)).   "It is the employer's duty to keep records of the employee's . . . hours. . . ."   *Id.*

> [I]n situations where the employer's records cannot be trusted and the employee lacks documentation, the Supreme Court held that an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.   The burden then becomes the employer's, and it must bring forth either evidence of the precise amount of work performed or evidence to negate the reasonableness of the inference to be drawn from the employee's evidence.   If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Id.* at 1316 (internal quotations and citations omitted) (citing and quoting *Anderson*, 328 U.S. at 687-88).

During her deposition, Baker testified that, when she reported "no lunch" and her hours went over 40 for the week, Geiger "would not pay [her] for that."   Baker Dep. at 219-20.   In addition, in her answers to interrogatories, she specifically identified multiple instances where she should have been given a "no lunch" credit, was not given that credit, and the omission resulted in unpaid overtime for the week.   *See, e.g.*, Baker Interrogatory Spreadsheet, Entry for Week of Sept. 20, 2015.   Baker's deposition testimony supports an inference that Geiger failed to properly record "no lunch" notations that were reported to her.   Baker has also specifically detailed the dates of these occurrences.   Thus, is it not clear that Baker needs the benefit of the *Anderson* burden-shifting

paradigm.   Regardless, Baker's testimony about Geiger's failure to record her "no lunch" days is sufficient to call into question the accuracy of Defendants' time and pay records.   *See Allen*, 495 F.3d at 1316 (reversing district court's denial of summary judgment and finding that plaintiffs called into question employer's time records where, among other evidence, one plaintiff testified the individual in charge of time sheets would white out time worked).[13]   Baker's detailed spreadsheet of alleged unpaid overtime hours, which was incorporated into her interrogatory answers, is also sufficient to show the amount and extent of her unpaid overtime work "as a matter of just and reasonable inference."   *See id.* at 1317-18 (reversing district court's denial of summary judgment; noting that plaintiffs' burden at trial may be met with evidence other than precise, written documentation; and finding that a plaintiff could show the amount and extent of unpaid overtime "as a matter of just and reasonable inference" where she could not produce documents proving her overtime work but testified to certain triggering factors for overtime work, such as PTO meetings that occurred every six weeks and kept plaintiff at work until 7:30 to 8:00 p.m.).

Defendants attempt to avoid this conclusion by limiting Baker's unpaid overtime claim to one instance—the work she performed on November 21, 2015.   Doc. No. 59, at 7-9.   In their

---

[13] In a footnote to their reply, Defendants suggest that *Allen* is distinguishable and, thus, that Baker cannot call into question the accuracy of their time records.   Doc. No. 65, at 3.   This argument is not well-taken.   In *Allen*, one of the plaintiffs testified that a supervisor would white out time that was reported on a time card, and the Eleventh Circuit concluded that such evidence (along with other allegations of tampering with time records) was sufficient to call into question the accuracy of the employer's records.   495 F.3d at 1316.   In this case, Baker did not have direct access to ADP and relied on her supervisors to record her "no lunch" requests.   On this set of facts, repeatedly failing to record a "no lunch" is analogous to whiting out time because it undermines the accuracy of Defendants' time records.   In their reply, Defendants also rely on *Estrada v. FTS USA, LLC*, No. 1:14-CV-23388-KMM, 2016 WL 6157989, at *1 (S.D. Fla. Oct. 24, 2016), *aff'd*, 688 F. App'x 830 (11th Cir. 2017), to argue that Baker has failed to call into question the accuracy of their time records.   That case is distinguishable because the plaintiff admitted that he never recorded all the hours he worked, and there does not appear to have been any allegation that the defendant was failing to record time that he reported.

opening motion, they reduce the remainder of Baker's claims of unpaid overtime to a footnote in their Undisputed Material Facts section and urge the Court to ignore the spreadsheet detailing her unpaid overtime claim as "after the fact self-serving hearsay" and "conclusory, unsupported allegations in the face of contemporaneous time records, edit logs, and pay records."  *Id.* at 7 n.2; *see also id.* at 16.  When Baker pointed out in her response brief that she had sworn to the unpaid overtime hours in her responses to interrogatories, Defendants argued in their reply that Baker could not avoid summary judgment by relying on her own "self-serving" interrogatory answers.  Doc. No. 65, at 4.  They also attempted to invoke a variation of the "sham affidavit" rule and argue that Baker's interrogatory answers could not provide a basis for avoiding summary judgment where those answers contradicted her deposition testimony.  *Id.* at 4-5.

Defendants' arguments that the Court should disregard the spreadsheet incorporated into Baker's interrogatory answers are misplaced.  First, Fed. R. Civ. P. 56(c)(1)(A) specifically allows a party to show that a fact is genuinely disputed by "citing to particular parts of materials in the record, including . . . interrogatory answers."  Defendants cite two cases providing that a party may not generally introduce its own interrogatory answers *at trial*, *see Grace & Co. v. City of Los Angeles*, 278 F.2d 771, 776 (9th Cir. 1960); *Lobel v. Amer. Airlines*, 192 F.2d 217, 221 (2d Cir. 1951)[14], but they cite no cases holding that a party cannot rely on its own interrogatory answers to avoid summary judgment.

Second, the fact that Baker's interrogatory answers and the spreadsheet of alleged unpaid overtime hours may be "self-serving" does not permit the Court to ignore them at the summary

---

[14] Notably, Defendants' reply brief represents that both of these cases stand for the proposition that "[a]t summary judgment, '[n]ormally, a party may not introduce his self-serving answers to an opponent's interrogatories.'"  Doc. No. 65, at 4.  Both of these cases involved the question of whether a party could read its own interrogatory answers into the record at trial, and neither case even includes the phrase "summary judgment."  The undersigned is troubled that Defendants would represent that the cases apply to a summary judgment.

judgment stage.  *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252-53 (11th Cir. 2013) ("To be sure, Feliciano's sworn statements are self-serving, but that alone does not permit us to disregard them at the summary judgment stage . . . .   Besides, Feliciano's sworn statements are no more conclusory, self-serving, or unsubstantiated by objective evidence than the officers' assertions that they smelled marijuana coming from her apartment and saw Gonzaga smoking or holding a joint.").   Likewise, Baker's detailing of her unpaid overtime claim is not the type of "conclusory" statement that must be disregarded at summary judgment.   Rather, it is a detailed recounting of facts of which she has first-hand knowledge.   Baker's deposition testimony also made it clear that she was not simply guessing at the extent of her unpaid overtime, but rather that she recreated the time by using text messages, emails, and other documents that she had in her possession.   *See id.* ("But Feliciano's sworn statements that Gonzaga was not holding anything in his hands when he emerged from the bedroom into the officers' view, that neither she nor Gonzaga was smoking marijuana, and that there was no marijuana odor in the apartment are not conclusory.   They are non-conclusory descriptions of specific, discrete facts of the who, what, when, and where variety. They describe the external world as Feliciano observed it at the time and are based on her first-hand personal knowledge, not her subjective beliefs.").

Third, Baker's detailing of her unpaid overtime claim—as embodied in the spreadsheet incorporated into her interrogatory answers—is not the type of inadmissible hearsay that cannot be considered at summary judgment, even if her lawyers are the ones who actually compiled the spreadsheet.[15]   Baker clearly has first-hand knowledge of the hours she worked while employed by

---

[15]  On this point, I note that, if an attorney's authorship of a document that is later signed by a witness under oath is enough to make it inadmissible "hearsay," then the declarations Defendants submitted in support of their summary judgment motion—which include nearly identical wording in places and were, presumably, drafted by Defendants' attorneys—would likely also be inadmissible.

Defendants, and her deposition testimony made it clear that she identified hours for which she should have been paid by referring to text messages, emails, and other contemporaneously-created documents.  Baker Dep. at 115-18.  Her attorneys then compiled information about her unpaid overtime hours into a spreadsheet, which she signed under oath as part of her interrogatory answers.  Doc. No. 63-1 and Baker Interrogatory Spreadsheet.  While the interrogatory answers themselves might be hearsay if Baker attempted to introduce them at trial, Baker's own first-hand testimony about her hours worked would not be.  Because the information in Baker's interrogatory answers may be reduced to admissible form a trial, the Court may consider it at the summary judgment stage.  *See Robertson v. Interactive Coll. of Tech./Interactive Learning Sys., Inc.*, ___ F. App'x ___, No. 17-11152, 2018 WL 3429949, at *2 (11th Cir. July 16, 2018) (per curiam) (cited as persuasive authority) (internal quotation and citations omitted) ("[W]hile inadmissible hearsay typically cannot be considered on summary judgment, a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form.").  Defendants are free to probe the credibility of Baker's claim to have recreated her unpaid hours months and even years after the fact at trial, but such credibility questions are for a jury to resolve, not for the Court to entertain on summary judgment.

Fourth, even assuming that the "sham affidavit" rule applies to exclude interrogatory answers that contradict deposition testimony[16], Baker's interrogatory answers are not so inherently

---

[16] Defendants do not cite any cases suggesting that it does.  Neither of the cases they cite address the question of a perceived conflict between a party's interrogatory answers and later-given deposition testimony by the same party.  Doc. No. 65, at 4 (citing *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012); *McMillian v. Johnson*, 88 F.3d 1573, 1584 (11th Cir. 1996)).  The "sham affidavit" rule normally applies "when a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact . . . and [that party attempts] *thereafter* [to] create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony."  *Tippens v. Celotex Corp.*, 805 F.2d 949, 954 (11th Cir. 1986) (emphasis added) (citation omitted).  Here, Baker signed her interrogatory answers *before* her deposition.  The Eleventh Circuit has indicated in *dicta* that "it is much less likely that an affidavit which precedes a weak deposition is filed as a transparent sham" than a discrediting

inconsistent with her deposition testimony that it is necessary to disregard them for summary judgment purposes.   Defendants are correct that, at her deposition, Baker could not testify "to any specific day or hours on the spreadsheet when questioned."   Doc. No. 65, at 5.   But that was because she wanted to be able to compare her own documents to the spreadsheet before testifying as to its veracity—not because she actually lacked knowledge or memory of her unpaid overtime claim.   Baker Dep. at 115.   Defendants did not ask Baker whether she reviewed her own documents and verified the accuracy of the spreadsheet incorporated into her interrogatory answers before signing those answers under oath.   Thus, Baker's deposition testimony does not contradict those interrogatory answers.   *Cf. Tippens*, 805 F.2d at 954-55 (refusing to disregard affidavit where affiant averred that decedent was his supervisor and worked in close proximity with him during the period when he was using defendant's asbestos containing products but later, at his deposition, was unable to state any specific instances when he was using a specific product while decedent was standing next to him; finding that the discrepancy might affect the witness's credibility and impeach his memory but that it did not create an inherent conflict).

        Finally, I note that, in addition to attempting to discount Baker's accounting of her unpaid overtime claim, Defendants also suggest that their time records are unimpeachable and that Baker cannot survive summary judgment unless she comes forward with contemporaneous documents proving that she worked unpaid overtime.   *See, e.g.*, Doc. No. 59, at 15 ("Plaintiff has not and can offer no evidence or records to demonstrate that she did in fact work any alleged overtime for which Defendants did not compensate her . . . .").   In making this argument, they rely on the fact that the ADP records show that, if overtime work was recorded in ADP, Baker was paid for that work and

---

affidavit that is filed after a deposition fails to create a genuine issue of material fact.   *Id.* n.6.

also on the fact that Baker knew that she was required to report her time to Defendants.   They then suggest that, having failed to report her time accurately, Baker cannot now claim entitlement to unpaid overtime.   *See, e.g.*, *id.* at 20 ("Plaintiff cannot deliberately underreport her work time and, after her separation from employment, seek to revise her time cards for the prior years to gain a windfall in wage payments.").   This argument is belied by both the facts and the law.

Factually, Defendants are incorrect to suggest that Baker completely controlled the reporting of her time and that this is a case where Baker simply failed to report the overtime hours to which she now claims entitlement.   The facts show that Baker relied on her supervisors to input her time when her time clock card was not working and when she worked from home (which was often). Thus, Defendants' ADP records are only as good as the information inputted by Baker's supervisors. But Baker has testified that her supervisors did not always input her time correctly.   *See, e.g.*, Baker Dep. at 116-18, 197, 220.   Thus, her case is distinguishable from cases cited by Defendants where a plaintiff completely controlled her time reporting and simply failed to report overtime hours. *See, e.g.*, *Brumbelow v. Quality Mills, Inc.*, 462 F.2d 1324, 1326 (5th Cir. 1972) (summary judgment granted on overtime claim where plaintiff admitted that she regularly reported hours worked not exceeding eight hours per day, even though she claimed to have worked more than the hours she reported to her employer); *Newton v. City of Henderson*, 47 F.3d 746, 748 (5th Cir. 1995) (summary judgment granted on overtime claim where it was undisputed that plaintiff was paid for all hours claimed on the time reports he submitted); *Straley v. Ferrellgas, Inc.*, No. 8:08-cv-2460-T-26MAP, 2009 WL 10670500, at *2 (M.D. Fla. Sept. 16, 2009) (summary judgment on overtime granted where plaintiff admitted that she never "turned in" the overtime hours she allegedly worked).

Defendants' arguments are also undermined by controlling law.   In *Allen*, the district court granted a motion for summary judgment on an unpaid overtime claim, finding, among other things

that (1) when employees worked overtime and recorded that time on their pay sheets, the employer paid overtime; (2) the employer trained employees on how to record and turn in their time sheets; and (3) because of the nature of the plaintiffs' work, their supervisors could not monitor them all the time.   495 F.3d at 1314.   Despite this, the Eleventh Circuit reversed, finding that the plaintiffs had sufficiently called into question the accuracy of the employers' records and had provided enough detail about their overtime claims "to show the amount and extent of their unpaid overtime as a matter of just and reasonable inference," even though they lacked precise documentation of their claimed hours.   *Id.* at 1316-17.   As explained above, Baker has also called into question the accuracy of Defendants' time records and has provided a detailed accounting of her claim that resulted from her review of text messages, emails, and other documents.[17]   Under *Allen*, this is enough to survive summary judgment on the question of whether Baker worked overtime hours for which she was not properly compensated.

## 2.   Employer Knowledge of Overtime Work.

In addition to showing that she worked overtime for which she was not compensated, Baker must also show that Defendants knew or should have known that she was working overtime for which she was not compensated.   *Id.* at 1314 (citations omitted).   A plaintiff can survive summary judgment on an unpaid overtime claim if a reasonable jury could conclude from the evidence that the employer had actual or constructive knowledge of the time worked.   *Id.* at 1318.   As explained above, Baker testified that she sometimes told Geiger that she had not taken a lunch, but that Geiger would not pay her for the missed lunch if she worked more than 40 hours.   Baker Dep. at 219-20.

---

[17] This distinguishes this case from the main case on which Defendants rely in the motion, *Straley*, 2009 WL 10670500, at *2.   In *Straley*, the plaintiff testified that she "could not begin to estimate the amount of time" that she worked off the clock and "could not identify anything that would help her make such an estimate, other than her personal speculation that computer records might reflect her log in and log out times." *Id.*

At the very least, this raises a question of fact as to whether Geiger—a supervisor—knew that Baker was working overtime for which she was not being properly compensated.   This is sufficient for Baker to survive summary judgment as to the question of Defendants' knowledge of the fact that she was working overtime without being properly compensated.   *See Allen*, 495 F.3d at 1318-19 (reversing district court's denial of summary judgment as to plaintiffs who created a genuine issue of material fact as to supervisor's knowledge of unpaid overtime work).

In attempting to avoid this conclusion, Defendants spend significant time discussing whether they had constructive knowledge of Baker's unpaid overtime—that is whether they "should" have known about the unpaid overtime.   Doc. No. 59, at 16-21.   But Baker does not need to resort to constructive knowledge because she has evidence of *actual* knowledge of the unpaid overtime on the part of Geiger.

Defendants also spend significant time criticizing the evidence that Baker marshaled in response to their motion for summary judgment.   They correctly note that Baker attempted to avoid summary judgment by relying on "examples" and explain why each of Baker's "examples" does not preclude summary judgment.   Doc. No. 65, at 1 n.1; *see also id.* at 4, 8.   In many respects, Defendants' criticisms are well-taken.   In her summary judgment response brief, Baker relied on "examples" of overtime work and directed the Court generally to various assorted documents attached to her response.   *See, e.g.*, Doc. No. 63, at 15 ("Emails and phone records show time worked that was not included in Plaintiff's time records, nor for which Plaintiff was properly paid overtime. (Exh. 2-14).").   This was improper.   It violated both Fed. R. Civ. P. 56(c)(1)(A), which requires the parties to cite to "particular parts of materials in the record," and the Case Management and Scheduling Order, Doc. No. 31, at 8, which required the parties to "provide pinpoint citations to the pages and lines of the record supporting each material fact."   Likewise, as set forth in Defendants'

reply brief, Baker has likely failed to establish that her "examples" actually create a genuine issue of material fact.[18]

However, in addressing the question of their knowledge about Baker's unpaid overtime, Defendants fail to address a piece of evidence that *they* put into the record—Baker's testimony that Geiger would not pay her for a missed lunch if her time went over 40 hours for the week.  *See* Doc. No. 59, at 8.[19]   This testimony creates a genuine issue of material fact as to whether Defendants knew that Baker was working overtime for which she was not properly compensated.

Because Baker has raised genuine issues of material fact as to whether she worked overtime for which she was not properly compensated and as to whether Defendants knew about that unpaid overtime, I recommend that the Court deny Defendants' motion for summary judgment as to Count I of Baker's complaint.

B.      *Retaliation Claim.*

In Count II of her complaint, Baker asserts that Defendants retaliated against her for

---

[18] For example, Baker points to the Court to cell phone records showing calls made outside the hours for which she was paid on several days, but offers no supporting evidence that such calls were work-related. *See, e.g.*, Doc. No. 63-2.   Likewise, Baker has filed hand-written time sheets showing more time worked than appears in the ADP records, but she submitted no supporting evidence establishing: (1) that the time in the hand-written time sheets is accurate; or (2) that the time in the hand-written time sheets was submitted to Defendants during her employment.   Doc. No. 63-10.

[19] I note that Defendants' motion claims that Baker could not recall any specific instances where she reported overtime and was not paid for it, but rather that she "generally" claims that Geiger sometimes failed to pay her for missed lunches if she worked more than 40 hours in a week.   Doc. No. 59, at 8.   To the extent that the reference to "generally" is meant as an argument that Baker's testimony is conclusory, I note that, as detailed above, Baker has also detailed the "no lunch" days for which she did not receive overtime pay specifically in her interrogatory answers and that she explained in her deposition that she relied on contemporaneously-created documents to identify overtime hours worked for which she was not compensated.   In this respect, Baker's testimony was considerably less conclusory than Geiger's declaration, which suggests that she *always* credited Baker with a "no lunch" whenever one was reported to her without any explanation of how she arrived at that conclusion or indication that she reviewed text messages, emails, or other documents sent to her by Baker and compared them to Defendants' ADP records before signing her declaration.   Geiger Dec. ¶ 16.   In addition, I note that, when questioning Baker about the "no lunch" claim at her deposition, Defendants attempted to undermine Baker's testimony by noting that Geiger had, in fact, sometimes paid Baker for overtime.   Baker Dep. at 220.   Such a line of questioning goes to Baker's credibility and is appropriate for a jury.

complaining about FLSA violations.   It is "unlawful for any person . . . to discharge . . .  [an] employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter. . . ."   29 U.S.C. § 215(a)(3).   In this case, Baker has not directed the Court to any direct evidence that Defendants retaliated against her for complaining about FLSA violations.   Thus, she must rely on the burden-shifting framework applied in employment discrimination cases.   *Henderson v. City of Grantville, Ga.*, 37 F. Supp. 3d 1278, 1282 (N.D. Ga. 2014) (citation omitted).   A plaintiff establishes a *prima facie* case of FLSA retaliation by establishing three elements: "(1) she engaged in activity protected under [the] act; (2) she subsequently suffered adverse action by the employer; and (3) a causal connection existed between the employee's activity and the adverse action."   *Wolf v. Coca-Cola Co.*, 200 F.3d 1337, 1342–43 (11th Cir. 2000) (citation omitted).   Once the plaintiff establishes a *prima facie* case, the burden shifts to the employer to assert a legitimate, non-retaliatory reason for the adverse action.   *Id.* at 1343.   If the employer asserts a legitimate reason for the adverse action, the burden shifts back to the plaintiff to show that the asserted reason is pretextual.   *Id.*   "In demonstrating causation, the plaintiff must prove that the adverse action would not have been taken 'but for' the assertion of FLSA rights."   *Id.* (citing *Reich v. Davis*, 50 F.3d 962, 965-66 (11th Cir. 1995)).

Defendants assert that Baker cannot make out a *prima facie* case of retaliation.   They also assert that, even if she could, their motion for summary judgment should be granted as to the retaliation claim because they have asserted a legitimate, non-retaliatory reason for their actions and Baker cannot show that the reason is pretextual.   I address these arguments separately, below.

 1. *Prima Facie* Case.

Defendants assert that Baker cannot make out any of the three prongs of a *prima facie* case of retaliation.   I address each prong separately, below.

a.      Protected Activity.

I recommend that the Court conclude that Baker has raised a genuine issue of fact as to whether she engaged in protected activity.   The anti-retaliation provisions of the FLSA protect both oral and written complaints about violations of the statute.   *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 17 (2011).   At her deposition, Baker testified that she complained to Sturm that Geiger had failed to properly record her work hours for November 21, 2015, as overtime. Baker Dep. at 112-13.   She also testified that she repeated the complaint to Przychocki in the fall of 2016.   *Id.* at 219-20.   The record also includes emails where she reported this issue to Defendants' payroll department.   Doc. No. 63-14.   Taken in the light most favorable to Baker, this is sufficient evidence for a jury to conclude that Baker complained to Defendants about not being paid at the overtime rate for her work on November 21, 2015.   Baker also testified that she told Przychocki in the fall of 2016 that "if [Baker] wrote 'no lunch' [on her timecard,] and if it went over 40, [Geiger] wouldn't pay [her] that."   Baker Dep. at 220.   Again, taken in the light most favorable to Baker, this is sufficient for a jury to conclude that Baker complained to Przychocki that she sometimes failed to receive overtime pay when she worked through lunch.

Defendants argue that the complaints about Baker's pay for her work on November 21, 2015, are not protected activity because she now admits that she was properly paid for that work—albeit during a different pay period.   Doc. No. 65, at 8.   Accordingly, Defendants suggest that Baker was really just "request[ing] to be paid on a different pay date . . . "   *Id.*   This argument is not consistent with the evidence.   While Baker may now admit that she was properly paid for the November 21, 2015 work on a paycheck that issued on December 11, 2015, at the time she made her first set of complaints (around December 7, 2015), she had not yet been paid for the time at all.   Moreover, taken in the light most favorable to Baker, the evidence supports an inference that Baker was

complaining about the time being designated as straight time—not simply complaining that she did not receive pay for the November 21 work in the paycheck that corresponded to that pay period. On this point, Defendants' reliance on *Foy v. Pat Donalson Agency*, 946 F. Supp. 2d 1250, 1275-76 (N.D. Ala. 2013), is misplaced.   In that case, the plaintiff complained generally about not getting paid promptly and regularly, which is not necessarily a violation of the FLSA.   Here, taken in the light most favorable to Baker, the evidence suggests that she complained that Geiger was attempting to pay her straight time for the November 21, 2015, work, instead of overtime, which would be a violation of the FLSA.   Thus, the complaints about the November 21 time qualify as protected activity under the FLSA.

Defendants also argue that Baker's complaint to Przychocki about unpaid lunches was not a complaint about unpaid overtime.   Doc. No. 65, at 9.   Specifically, Defendants argue that when Baker was asked about her fall 2016 conversation with Przychocki at her deposition, she testified that the conversation was about her Saturday work for Dr. Gupta in November 2015 and that there was no discussion of any alleged unpaid lunches by Geiger.   *Id.*   They then quote this portion of Baker's deposition:

> Q.    Okay.   What did you specifically say about changing your time?
>
> A.    In that particular conversation?
>
> Q.    Yeah, to [Przychocki].
>
> A.    [Geiger] was going—[Geiger] didn't pay me on that Saturday.   I explained that story we've talked about working with Gupta.

*Id.* (quoting Baker Dep. at 220).   This argument rests on a mischaracterization of the evidence. Inexplicably, Defendants have omitted the remainder of Baker's answer.   The totality of her answer reads:

> A.    [Geiger] was going—[Geiger] didn't pay me on that Saturday.   I explained that story that we've talked about working with Gupta.

> She would put off not paying me for mileage, and then my trip to Tampa.  She'd go in and change[] my time sheets or my time card.  *And if I wrote "no lunch," and if it went over 40, she wouldn't pay me that.*

Baker Dep. at 220 (emphasis added).   Taken in the light most favorable to Baker, this testimony supports an inference that Baker complained to Przychocki about Geiger sometimes not paying Baker overtime for weeks in which she missed lunches, which is protected activity under the FLSA.

b.   <u>Adverse Action</u>.

I recommend that the Court find that Baker has raised a genuine issue of fact as to whether she suffered an adverse action after engaging in protected activity under the FLSA.   Baker's complaint alleges that Defendants involuntarily terminated her employment in retaliation for complaining about FLSA violation.   If true, this would violate the FLSA's anti-retaliation provision.   *See* 29 U.S.C. § 215(a)(3) (prohibiting discharging an employee in retaliation for protected activity).   Defendants argue that Baker did not suffer an adverse action because she was not terminated but, in fact, she resigned.   They then devote considerable space to discussing whether the facts of this case would support a claim for constructive discharge.   Doc. No. 59, at 23-25.

Defendants' argument jumps too quickly to the conclusion that this is a constructive discharge case.   As set forth in the Facts section, above, the circumstances surrounding Baker's separation from employment are murky.   After Baker provided Przychocki with her school schedule, Przychocki told Baker that the schedule could not be accommodated.   She offered to let Baker remain employed on per diem basis, but Baker declined that offer, saying that she needed health insurance.   There then followed an email exchange in which Przychocki asked Baker if she would resign.   Baker repeatedly said that she could not resign.   *See generally* Doc. Nos. 63-16, 63-18, 63-19.   In response, Przychocki reiterated that Baker's schedule could not be accommodated

and that Baker would "not remain as the full time materials manager with the proposed schedule." Doc. No. 63-19, at 4.   Further emails between Baker, Gearhart, and Kennedy do not shed further light on whether Baker resigned or was involuntarily terminated.   The record then goes silent from April 24 until April 28, which is reported in Defendants' records as Baker's separation date. Defendants' paperwork does not explicitly state whether Baker's separation was voluntary or involuntary—it simply notes that the reason for separation was "schedule conflicts."   Doc. No. 59-3, at 34.   Notably, despite Defendants' claims that Baker "resigned" and "abandoned her job" (Doc. No. 65, at 10), none of its witnesses have averred that Baker resigned or abandoned her job.   At her deposition, Baker also testified that she did not quit.   Baker Dep. at 41.   Taken in the light most favorable to Baker, this set of facts could support an inference that her separation from employment was not voluntary—that is, once she declined the per diem position, refused to alter her school schedule, and refused to resign, Defendants involuntarily ended her employment.   Accordingly, I recommend that the Court find that Baker has raised a genuine issue of material fact as to whether she suffered an adverse employment action after her complaints of FLSA violations.

c. Causation.

Although Baker has made out genuine issues of fact as to the first two prongs of her *prima facie* case, I recommend that the Court find that she has not raised a genuine issue of material fact as to the third prong—causation.   Thus, I recommend that the Court grant Defendants' motion for summary judgment as to her retaliation claim.

In her summary judgment briefing, Baker relies solely on the temporal proximity between her complaints of FLSA violations and her termination to establish causation.   Doc. No. 63, at 17. A plaintiff can meet this prong of her *prima facie* case if she can prove a "close temporal proximity" between the time her employer learned about her protected activity and the alleged retaliatory

conduct. *Raspanti v. Four Amigos Travel, Inc.*, 266 F. App'x 820, 823 (11th Cir. 2008) (citation omitted) (cited as persuasive authority). "This standard requires that the actions be 'very close.'" *Id.* (citing *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001)). A delay of "three to four month[s]" is too attenuated to support an inference of causation. *Id.* (citing *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)).

As set forth above, Baker's last complaint about FLSA violations was made to Przychocki in the fall of 2016, at some point before Przychocki took over from Geiger as Baker's supervisor. Baker Dep. at 219-20. Przychocki became Baker's supervisor in December 2016. Doc. No. 62 ¶ 10. Thus, the absolute latest that Baker's complaint could have occurred was December 31, 2016. The facts establish, though, that Przychocki did not tell Baker that her school schedule could not be accommodated until April 10, 2017—almost three-and-a-half months after the last possible date that Baker could have made the complaint. Przychocki Dec. ¶ 18; Doc. No. 63-16, at 1. And Baker's formal separation from employment came even later—on April 28, 2017. The gap between Baker's last complaint and the adverse action taken against her is simply too long to support an inference of causation. *See Raspanti*, 266 F. App'x at 823.

Baker attempts to avoid this conclusion by arguing that she made *another* complaint about FLSA violations—this one much closer to her termination. Specifically, she points to the emails she sent on April 24, 2017, in response to Przychocki's directive that Baker begin taking a 30-minute lunch each day. She argues, "[J]ust one day prior to her last day worked, Plaintiff complained that despite her trying to take lunch off, everyone would interrupt her and *therefore she was not getting paid for this time.* (Exh. 17). Only on the heels of emails regarding lunches and overtime did Defendants suddenly say that they could not accommodate Baker's school schedule." Doc. No. 63, at 17 (emphasis added). This argument is misplaced on both counts. First, Baker's April 24

emails merely report that she had worked through some or all of several lunch breaks and that her co-workers were not respecting her lunch breaks.   Contrary to counsel's argument, Baker's emails include no mention that she was not getting paid for the time.   Doc. No. 63-17.   Being forced to work through lunch is not a violation of the FLSA (assuming that the employee is properly compensated for the time).   Thus, these emails do not constitute protected activity.

Second, even if the emails did constitute protected activity, the record shows that Przychocki told Baker that her school schedule could not be accommodated for the first time on April 10, 2017—two weeks *before* Baker's emails about being forced to work through lunch.   The fact that Defendants ultimately carried through with that decision after Baker's emails is not evidence of causation.   *See Saffold v. Special Counsel, Inc.*, 147 F. App'x 949, 951 (11th Cir. 2005) (citing *Clark Cty. Sch. Dist.*, 532 U.S. at 272) (cited as persuasive authority) (concluding, in a Title VII case, "When an employer makes a tentative decision *before* the protected activity occurs, the fact that an employer proceeds with such a decision is not evidence of causation.").

Because Baker has not raised a question of material fact as to causation, she cannot make out a *prima facie* case of retaliation.   Therefore, I recommend that the Court grant Defendants' motion for summary judgment as to Count II of her complaint.

### 2.   Legitimate, Non-Retaliatory Reason and Pretext.

As discussed above, I recommend that the Court grant Defendants' motion for summary judgment as to Baker's retaliation claim because she cannot make out a *prima facie* case.   Even if the Court disagrees with that recommendation, I recommend that the Court still grant Defendants' motion for summary judgment as to Baker's retaliation claim because Defendants have proffered a legitimate, non-retaliatory reason for their actions and Baker has not shown pretext.

As explained above, Przychocki told Baker that her school schedule—which required Baker to be in class from 1:00 p.m. to 6:00 p.m. on Mondays and Wednesdays—could not be

accommodated because the Park Place Surgery Center needed a full-time materials manager and Baker's proposed school schedule did not meet the needs of the center.   Doc. No. 63-16.   This is a legitimate, non-retaliatory reason.   Thus, the burden shifts to Baker to show that the proffered reason is pretextual.

Baker has not shown that the reason is pretextual.   "To show pretext, a plaintiff must come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."   *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (internal quotation and citation omitted) (FMLA retaliation case).   A three-and-a-half month time gap between protected activity and adverse action is, standing alone, insufficient to show pretext.   *See Wascura v. City of S. Miami*, 257 F.3d 1238, 1245 (11th Cir. 2001) (citations omitted) (ADA retaliation case).   Thus, the timing of Defendants' refusal to accommodate Baker's school schedule cannot, standing alone, prevent the entry of summary judgment on this claim.   Pretext may, however, be shown in other ways, such as showing that: (1) the employer has failed to clearly and consistently articulate the reason for the employee's discharge; (2) the employer has deviated from its own standard procedures; or (3) a similarly situated employee was treated more favorably.   *See Hurlbert*, 439 F.3d at 1298 (citations omitted) (FMLA retaliation case); *Walker v. St. Joseph's/Candler Health Sys., Inc.*, 506 F. App'x 886, 889 (11th Cir. 2013) (citations omitted) (Title VII discrimination case) (cited as persuasive authority).

Baker has admitted that she knows of no comparators who were treated more favorably, Baker Dep. at 213, and she does not appear to allege that Defendants deviated from their own standard procedures in failing to accommodate her school schedule.   Instead, she attempts to

suggest that Defendants were not consistent in their rejection of her proposed school schedule, arguing, "Plaintiff was told her school schedule would be accommodated . . . ."  Doc. No. 63, at 18.   The record, however, includes no evidence that this is true.   To support this argument, Baker apparently relies on her own email to Przychocki, in which she stated:

> When I accepted this job I was just starting the program and was told that they would work with my schedule. . . .   When I was being transferred to [Park Place Surgery Center] by Kay's and Angie they told me to go back to school and finish my program that I would have more time to do so here at [Park Place].   I do not understand why the words of administrators are not being held to.   None of this was told to me several months ago when I told you was expected back into the program.   I understand you thought I was in the night program, however when you asked me on multiple occasions if my classes were at night and I replied with I do not think so because [M]ay is the day program this would not be an issue.

Doc. No. 63-18, at 2.   Baker's email claims to Przychocki about what she was told are, of course, not the same as evidence of that she was *actually* told any of the things stated in the email. Moreover, at best, Baker's email supports an inference that she was told generally that Defendants would work with her and that some schedule accommodations might be allowed.   It does *not* establish that anyone ever told her that she had *carte blanche* to miss as much work as she wanted to attend school or that she could miss work to attend a class that met from 1:00 p.m. to 6:00 p.m. every Monday and Wednesday.   Indeed, it is undisputed that Baker did not provide Przychocki with her specific school schedule until April 10, 2017.   Przychocki Dec. ¶ 18.   Accordingly, Baker has not established that Defendant changed its position regarding her school schedule.

Baker does not point the Court to any other evidence that might support an inference of pretext.   For the sake of completeness, however, I note that Baker testified that she thought her job could be performed in 32 hours per week.   Baker Dep. at 215.   Such testimony does not create a genuine issue of material fact as to pretext.   At best, Baker's testimony establishes that she disagreed with Defendants' conclusion that her school schedule was incompatible with the needs of Park Place Surgery Center and that she believed she could perform her job duties despite needing

to be in class from 1:00 p.m. to 6:00 p.m. every Monday and Wednesday.   However, "[a] plaintiff is not allowed to recast an employer's proffered nondiscriminatory reasons or substitute his business judgment for that of the employer.   Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."   *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2002) (citations omitted) (ADA discrimination case).   Moreover, "[t]he inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of [her] performance."   *Cabrera v. Town of Lady Lake, Fla.*, No. 5:10-cv-415-Oc-34PRL, 2013 WL 12092573, at *21 (M.D. Fla. Mar. 28, 2013), *aff'd*, 556 F. App'x 801 (11th Cir. 2014) (internal quotation and citation omitted) (FLSA retaliation claim).

Here, Defendants' proffered reason is reasonable, particularly in light of the undisputed record evidence that Baker frequently worked more than 32 hours per week.   Doc. No. 59-1, at 8-39; Doc. No. 59-2; Doc. No. 59-3, at 1-33.   Baker's opinions about her ability to perform her job duties while taking off significant time to go to school say nothing about whether *Defendants* sincerely believed that her school schedule could not be accommodated.

To avoid summary judgment on a retaliation claim, a plaintiff must "come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision."   *Chapman*, 229 F.3d at 1024.   Baker has failed to meet that burden.   Accordingly, even if the Court disagrees with my recommendation as to Baker's ability to make out a *prima facie* case, I recommend that it grant Defendants' motion for summary judgment as to Baker's retaliation claim.   *See Cabrera*, 2013 WL 12092573, at *21-22 (granting summary judgment on FLSA retaliation claim where plaintiff failed to create genuine issue of material fact as to pretext).

**V.     RECOMMENDATIONS.**

For the reasons stated above, I **RESPECTFULLY RECOMMEND** that the Court do the following:

(1) **GRANT** Defendants' motion for summary judgment as to Baker's FLSA retaliation claim (Count II of her third amended complaint);

(2) **DENY** Defendants' motion for summary judgment as to Baker's unpaid overtime claim (Count I of her third amended complaint); and

(3) **DENY** Defendants' Motion for Summary Judgment (Doc. No. 59) in all other respects.

<u>**NOTICE TO PARTIES**</u>

A party has fourteen days from this date to file written objections to the Report and Recommendation's factual findings and legal conclusions.   A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation.   *See* 11th Cir. R. 3-1.

Recommended in Orlando, Florida on October 23, 2018.

*Karla R. Spaulding*

KARLA R. SPAULDING
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Presiding District Judge
Counsel of Record
Unrepresented Party
Courtroom Deputy